**Debevoise & Plimpton**

Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
+1 212 909 6000

October 7, 2025

**VIA ECF**
The Honorable Laura Taylor Swain
United States District Court
Southern District of New York
500 Pearl St.
New York, New York 10007

        Re:    <u>United States v. William Tomita, 22-cr-231-LTS</u>

Dear Chief Judge Swain:

      It is our privilege to represent Will Tomita.  We respectfully urge Your Honor to impose a non-custodial sentence when Will comes before the Court for sentencing.  His cooperation was exemplary in every respect and alone warrants a sentence without imprisonment.  But beyond that, Will has earned a non-custodial sentence through his remarkable effort to wholly transform his life.  He is a different person today than he was as Head Trader of Archegos Capital Management.

      Will participated in the charged crimes entirely at the direction of Bill Hwang, the domineering head of Archegos, who manipulated Will and abused his trust.  Will acknowledges the serious role he played in the misconduct and feels ashamed of his mistakes—especially of letting his fear and reverence for Hwang overpower his judgment.  Four years ago, after Archegos collapsed and law enforcement began investigating, Will resolved to chart a new path in life.  He decided not only to stand up to Hwang, but also to take a hard look at who he had become, and to change his life.

      Will has lived up to that commitment.  As a result of Will's extensive cooperation, Hwang stands convicted of masterminding one of the largest frauds in Wall Street history.  And even more impressive than his cooperation is the dedication Will has shown to turning his life around after years of emotional abuse under Hwang.  At 42 years old, he has found his calling in the art world, doing work he finds genuinely rewarding.  He is pursuing his passions—starting a community-oriented art gallery and volunteering with local organizations that help animals.  He is an ethical and a caring person, with strong connections to his family, friends, and dog.  Will's own words to the Court speak more powerfully than we ever could.  *See* Ex. A, Will Tomita Letter.

      There are multiple compelling reasons why a non-custodial sentence is the only fair and appropriate sentence for Will:

*First*, **Will participated in the criminal activity entirely at Hwang's direction and control.** Will began working for Hwang in 2008 at Tiger Asia, shortly after graduating from college. He came to view Hwang as a father figure—he trusted Hwang implicitly, believed he was an investing genius, and felt a constant pressure not to let him down. But Hwang was an imperious boss. Although Will's title at Archegos was Head Trader, his discretion was extremely limited, especially during the six-month period of his criminal activity that preceded the firm's collapse. For example, Hwang alone devised the scheme and directed the trading activity; Will did little more than execute the trades. It was at Hwang's direction that Will and others lied to Archegos's counterparties, seeking to conceal and facilitate the unlawful trading in those final months of Archegos's existence.

Will completely owns up to the role he played in these events. To this day, he feels deep shame and remorse, as he describes in his letter to the Court. He knows he should have stood up to Hwang when, after more than a decade of working together, Hwang first began directing Will to engage in a pattern of trading that was not only aggressive but criminal and manipulative. Will knows he should have put a stop to conduct he understood to be wrong. But at that time, Will was not yet ready to confront Hwang or to walk away from the relationship that had defined him since 2008. A fair assessment of what transpired at Archegos must recognize that while Will bears responsibility for his actions, Hwang manipulated Will, abused his trust, and used him for Hwang's own ends.

*Second*, **Will's extraordinary cooperation resulted in Hwang's conviction.** Will was shellshocked when Archegos collapsed. Even as the firm's financial condition rapidly deteriorated in March 2021, Will believed Hwang had a plan and that Archegos would somehow endure. Then the firm imploded, wiping out not only much of Will's life savings but also his sense of self-worth. Will fell into a deep depression. He desperately wanted to find a way out from under Hwang's thumb—and to help make things right. When the FBI raided his house six months later, it was the wake-up call he needed. Immediately, he decided he was ready to come clean and stand up to Hwang.

In October 2021, prior to any charges being filed in this case, Will began cooperating with the Government and never looked back. He found that openly admitting to what took place at Archegos—confronting the truth for the first time in years—helped to ease his own pain. Will became determined to take responsibility for his actions and help the Government unravel the fraud. He believed that cooperating with the authorities (including the SEC and CFTC), helping them to pursue justice and secure restitution for victims, was an important step toward turning his own life around. Will completely dedicated himself to the job of cooperating. He made it a mission to candidly answer every question he was asked, and to thoroughly review and explain the extensive documentary evidence.

Over a period of years, Will met with the Government nearly 40 times. He testified for over two weeks at the trial of Hwang and his co-defendant, Patrick Halligan (Archegos's former CFO), which included nearly five days of cross-examination. Notably, Hwang's and Halligan's counsel completely failed to impeach Will's testimony, and no evidence contradicted the narrative that he provided. But Will's prolonged testimony was difficult and he broke down on multiple occasions, particularly when faced with the extent of Hwang's abuse over the years.

Will's testimony was of singular importance to the Government's case. He was the most important witness and a key reason why the jury convicted the defendants, leading Judge Hellerstein to sentence Hwang and Halligan to 18 years and 8 years of imprisonment respectively, and to impose over $9.5 billion in restitution and forfeiture obligations. A non-custodial sentence would appropriately recognize the extent and significance of Will's cooperation, and would be fully consistent with the sentences imposed on similarly situated cooperating defendants in this District. In particular, given the non-custodial sentence imposed by Your Honor on Scott Becker—the other cooperating defendant in this case—a non-custodial sentence here is both appropriate and necessary to avoid unwarranted sentencing disparity.

*Third*, **Will has completely transformed his life.** In the wake of Archegos's collapse, Will spent long hours reflecting on his time at Tiger Asia and Archegos working under Hwang. He came to realize that he never found the work fulfilling. He had been sacrificing his autonomy and his ethical values, working punishing hours in a toxic environment because of his perceived need to prove his loyalty and prowess to Hwang. But when Will resolved to stand up to Hwang and cooperate with the Government, he also decided to stand up for himself—to reconcile who he had become with who he knew he was at his core.

Will has sought to reorient his life around the values he was raised on—integrity, honest hard work, and making a positive impact on other people. Over the past four years, he has immersed himself in educational, professional, and volunteer opportunities seeking to contribute to his community through his passion for art and his love of animals. Among other things, Will obtained a master's degree in art business, started a community-oriented art gallery, and is pouring his heart into making it successful, while regularly volunteering at the John D. MacArthur Beach State Park to help with animal conservation and protection. Will is also undergoing treatment to recover from years of emotional abuse under Hwang. Today, Will has found greater satisfaction than he has experienced in many years. He is contributing to society, rekindling relationships with his friends and family, and enjoying the companionship of his dog, Kona. There is no risk of Will ever committing another crime; rather, he has immense promise to lead a meaningful, productive, and law-abiding life.

For all of these reasons, discussed further below, and as the Probation Office has also recommended, we submit that Will has earned a sentence without imprisonment.

I.  **Hwang Devised and Directed Both Criminal Schemes, and Will Followed His Orders**

The criminal conduct in this case was extremely serious and harmed real people, from the innocent Archegos employees whose savings were invested in the firm, to investors in the companies whose stock prices were manipulated, to employees of the banks that were defrauded. As Will conveys in his letter to the Court, he continues to feel immense sadness and remorse for the damage he helped to cause. But context is critical to a fair evaluation of Will's role in this conduct. Will did not knowingly join a criminal organization. Archegos was a legitimate investment firm and a client of numerous global financial institutions prior to its collapse. Between 2008, when Will started working under Hwang, and late 2020, when Hwang set Archegos on a new and dangerous path, Will never came close to violating the law. Further,

when Will participated in criminal activity in the approximately six months before Archegos collapsed, Hwang alone devised the schemes and directed Will and others to carry them out.

### A. *Market Manipulation*

For many years at Archegos, Hwang pursued an investing approach that sought to identify publicly traded companies that he believed were undervalued and would rise in price over a multiyear period. But when the COVID-19 pandemic hit, causing a sharp downturn in U.S. public markets, Hwang decided that, as many investors pulled back, Archegos would double down on aggressively buying a select group of specific stocks. *See* Trial Tr. 3078–83.

As Archegos shifted to remote work, Will came to spend virtually his entire day under Hwang's watchful eye. He and the other traders participated in a continuous Zoom meeting with Hwang every day, along with a Bloomberg chat that ran simultaneously. Through these means, Hwang monitored the traders and directed every decision that was even remotely consequential. *See* Trial Tr. 3129, Trial Tr. 3132 ("Every day the U.S. market was open we were all on that Zoom together."). Hwang told Will and the other traders which stocks to trade, at what time, and at what limit prices. *See* Trial Tr. 3715, Trial Tr. 4181, Trial Tr. 5100:14–15, Trial Tr. 5101:1–5 (Government summation: "And remember the way that Hwang went about his trading is that he was on Zoom with the traders, but he simultaneously had a Bloomberg chat . . . where he . . . commanded how it was that they were to trade."). Hwang directed the trading team to amass enormous positions in Hwang's chosen group of stocks, "rais[ing] his voice and yell[ing] at [the traders] for not being aggressive enough," Trial Tr. 3187, and scolding them for conferring with others (including compliance) about trading guidelines, Trial Tr. 3314 (Will testifying that Hwang screamed at him: "How dare you go to compliance and do something so stupid").

Hwang avoided public scrutiny as Archegos's trading positions became increasingly concentrated by directing the traders to buy "total return swaps,"[1] rather than traditional equities, as such swaps have no public reporting requirement. Trial Tr. 3050–51 (Will explaining that, for swaps, "because the legal owner of those shares on swap is not Archegos but that third party . . . even if it was on Archegos' behalf, [the third party] would be the entity that files that disclosure saying that it owns those shares"). Further, Hwang directed all of Archegos's trading to be on margin (with funds loaned from its bank counterparties). This meant that at the end of each trading day, Archegos would either post additional capital, if the value of its positions went down, or receive additional buying capacity from its bank counterparties, if the value of its positions increased ("variation margin"). This daily variation margin created a strong incentive for Hwang to seek to increase the market price of Archegos's holdings at the end of each trading day. Trial Tr. 3040 ("Q. So what would happen if, at the end of a trading day, Archegos' positions overall were up from the day before? A: The fund would make money, and we were able to claw back from the banks what's called variation margin. So, in effect, making that money, we could then have the banks pay it to us.").

---

[1] A total return swap is a derivative contract that provides the holder with economic exposure to a security's price while its counterparty remains the security's owner of record.

By the fall of 2020, Hwang increasingly sought to use Archegos's market power to impact the prices of the select group of stocks that he was trading. He became obsessed with maximizing Archegos's ability to get more "capacity" from its bank counterparties—meaning, the ability to purchase additional exposure to the same stocks via total return swaps. Trial Tr. 3168:23–3169:8. Because of the variation margin adjustments, Archegos's capacity effectively increased or decreased with the value of its holdings at the end of each trading day. Hwang directed Will to trade in a manner that intentionally moved the market to inflate the value of Archegos's holdings, and Will executed on Hwang's strategy. To manipulate the stock prices, Hwang directed Will and the other traders to undertake a variety of strategies, including timing their orders to happen at particular times of day, trading in very large volumes, and strategically coordinating certain transactions to impact market prices. *E.g.*, Trial Tr. 3183, Trial Tr. 3331 ("Q. Did [Hwang] direct you to make trades in large volumes during [the June, July, and August of 2020] time period? A. Yes, he did."). As this strategy succeeded in obtaining additional variation margin, Hwang directed the traders to plow that margin into further exposure to the same stocks. Trial Tr. 3040:1–13.

Although Will's title was Head Trader, he had no discretion over this trading strategy. *See, e.g.*, Trial Tr. 3075 ("Q. And who picked the stocks? A. Bill Hwang did. Q. Who decided when to buy or sell a stock? A. Bill did."). Hwang directed specific trades, Trial Tr. 3116, specific counterparties, Trial Tr. 3063–64, and specific trading techniques, Trial Tr. 3042, to ensure the market prices of Archegos's holdings remained inflated. Hwang would lash out at any sign of perceived insubordination. *See, e.g.*, Trial Tr. 3062 (Hwang scolding Will: "You listen to me"). Will, like the other traders, feared being punished or ridiculed by Hwang. On one occasion, for example, when Hwang felt Will had shared too much information with a counterparty, he mocked Will as an "Eagle Scout." Trial Tr. 3416. Hwang berated Will when he thought he fell short in some way, Trial Tr. 3184:17–24, Trial Tr. 828:12–14 (S. Becker testimony) (Hwang telling Will in front of coworkers, "perhaps you should go work somewhere else if you don't agree with me"), but praised Will for "defending" a stock's price in accordance with Hwang's directions, Trial Tr. 3111:8–3112:2, Trial Tr. 3203:4. This is the management style that Will had dealt with for as long as he had worked under Hwang. It had always been toxic—but it was not until late 2020 that Hwang deployed this style in furtherance of a criminal scheme.

### B. Misrepresentations to Obtain and Increase Capacity

The manipulative trading scheme depended for its success on a second scheme, which Hwang also devised and directed: lying to Archegos's bank counterparties in order to obtain more trading capacity. Hwang needed to obtain additional capacity for Archegos because his trading strategy led to extremely large and concentrated positions in a small group of stocks, which triggered various limitations at Archegos's bank counterparties. To secure additional capacity, Hwang directed Will and others to lie about the concentration of Archegos's positions, the liquidity of its positions, and the particular stock swaps that comprised its portfolio.

To provide a few examples: In October 2020, Hwang sought increased capacity in the stock GSX. At Hwang's direction, Will lied to Deutsche Bank, saying that other banks had denied Archegos capacity because there were "multiple hedge fund longs on swap." Trial Tr. 3399. This was false, as the exposure to GSX was almost entirely due to Archegos's own position. Trial Tr. 3397–99. Similarly, in November 2020, Hwang was desperate to add

Goldman Sachs as a counterparty in order to gain more capacity. In response to Goldman's request for a list of the stocks that Archegos was interested in trading, Hwang directed Will to provide a list of "dummy [and] decoy" securities and portfolios to Goldman to obscure the fact that Archegos had large positions at other banks. Trial Tr. 3357–60. Will did so, and Goldman agreed to grant Archegos capacity. Trial Tr. 3379:17–19, 3387:11–17. And in the weeks prior to Archegos's collapse, at Hwang's direction, Will misrepresented to UBS that Archegos could fully unwind its positions in a span of six weeks. In reality, given the size of Archegos's positions by that point, a full unwinding would have taken months or even years. Trial Tr. 3431–34. UBS then granted Archegos capacity, which it used at Hwang's direction. Trial Tr. 3432:9–15.

### C. Archegos's Collapse

Hwang's schemes fell apart in late March 2021. ViacomCBS (one of the stocks in which Archegos had built up a massive position) announced an equity offering, which led Hwang to fear that the stock would decline. To try and prevent the price from collapsing—which would have been disastrous for Archegos, given the size of its position and the rates at which it was paying margin to its counterparties—Hwang directed Will to get as much capacity in Viacom as possible, seeking to buy nearly a billion dollars in additional exposure. Trial Tr. 3485, Trial Tr. 3477:7–18. The effort failed and Archegos's position in Viacom—which exceeded $11.5 billion as of February 2021, Trial Tr. 3336—quickly evaporated. Facing margin calls that Archegos could not meet, Hwang directly lied to Archegos's counterparties, assuring them that Archegos merely had a "liquidity" issue, rather than a "solvency" issue. Trial Tr. 3549, Trial Tr. 5160 (Government summation: "Hwang himself is lying to the banks about the portfolio, about liquidity in just the same way that Halligan, Tomita, and Becker had done for the prior year. Hwang does it brazenly on a call with senior bank leaders and in front of his inner circle at Archegos."). But within days, the counterparties declared a default and sold the stocks they held in connection with their swap agreements with Archegos, sending the artificially inflated stock prices into a downward spiral. Trial Tr. 3578. On March 26, 2021, Archegos announced that it was winding down. Will—like the other Archegos employees whose deferred compensation was invested in the fund, *see* PSR ¶¶ 99, 108—lost the vast majority of his savings.

* * *

Will took part in this criminal activity and bears responsibility for his actions. He has never tried to minimize his role. Yet Hwang alone devised these schemes. Hwang alone made both the major strategic calls and the smaller, day-to-day and even minute-to-minute decisions about which stocks to trade, and at what times and prices, and about which counterparties to contact, what information to share, and what information to hide or misrepresent.

Will committed these crimes because Hwang directed him to do so. Hwang abused his authority, the loyalty he demanded, and the implicit trust that Will placed in him for years. Hwang knew he had fostered a relationship with Will, and an atmosphere at Archegos, which made it extremely difficult for Will to do anything but follow his orders. That is not an excuse—Will knows he should have pushed back or walked away. He lacked the strength and presence of mind as these events unfolded, and was too blinded by his fear and faith in Hwang. But as discussed below, Will soon resolved to admit the truth and cooperate with the Government in an effort to make amends for his serious mistakes.

**II. Will's Extraordinary Cooperation Resulted in Hwang's Conviction and Billions in Forfeiture and Restitution for Victims**

A review of the trial transcript makes plain that the Government could not have convicted Hwang without Will's cooperation. The Government cited Will's testimony repeatedly in their closing statement and again in their sentencing submission for Hwang (far more than they cited any other witness).[2] Will's testimony was so crucial because he provided firsthand insight into Hwang's subjective knowledge and intent—elements the Government needed to prove beyond a reasonable doubt—based on Will's direct interactions with Hwang during the critical six-month period of criminal activity. The jury saw that Will answered questions candidly, including on cross-examination, and they benefited from the context and explanations he provided from over a decade of working under Hwang.

Will's cooperation also was critical in allowing the Government to bring charges against Hwang and Halligan in the first place. Over the course of numerous meetings with investigators, Will pulled back the curtain on Archegos and walked the Government through every facet of the schemes, from Hwang's overarching strategy to his granular trading decisions. It was through these meetings that the Government gained a sufficiently robust understanding of the events to develop the market manipulation, fraud, and racketeering legal theories that they charged.

> **A.** *Will Cooperated at an Early Stage, Standing Up to Hwang—His Boss and Mentor for Over a Decade.*

In late 2020 into early 2021, as Hwang dictated orders over their continuous Zoom and as the trading strategy became increasingly aggressive—eventually crossing the line into being intentionally manipulative—Will felt trapped. In the midst of the firestorm, Will could not bring himself to fully face the situation for what it was. Even as Archegos neared implosion, Will harbored a belief that Hwang, somehow, would find a solution. Will had worked under Hwang since 2008—virtually his entire professional career to that point—and revered Hwang as both a father figure and an investing genius. Will also feared him and could not bear to think of what might happen if he left—or, worse, tried to challenge Hwang's decisions. Will also felt a sense of loyalty to his junior traders and did not want to abandon them. So he (and his life savings) went down with the ship.

In the aftermath of Archegos's collapse, Will fell into a deep depression, despairing over the harm that he had been a part of. His life savings evaporated with the fund and he needed to borrow money from family members to meet monthly expenses. Hwang offered Will (and other employees) a position at his non-profit, the Grace & Mercy Foundation. Will accepted the offer, and was paid roughly the same base salary he had earned at Archegos. But he was not expected to do any real work, and the situation did not sit well with him. Around that time, Hwang told

---

[2] For example, the Government referenced Will's testimony 87 times during its summation, *see* Trial Tr. 5096–5173, and referred to Will or his trial testimony 43 times in its sentencing memorandum for Hwang, *see generally*, Sentencing Memorandum of the United States, United States v. Hwang, No. 22-cr-240, Dkt. No. 340 (Nov. 15, 2024).

Will that he wanted him to be a "team player." Will started to appreciate that Hwang was trying to buy his silence, and that he and others had committed serious crimes.

In September 2021, before any charges were filed in this matter, the FBI executed a search warrant at Will's residence. It was a potent wake-up call for Will. He wanted to speak the truth—and wanted to stand up to Hwang—and realized he could not wait any longer. Within days, Will began meeting with the Government. He never looked back. He admitted to the criminal conduct, took responsibility for the role he played, and pled guilty to a five-count information prior to the Government bringing any public charges. Will also resigned from Grace & Mercy and permanently severed his ties to Hwang.

At the time he started cooperating, 37-year-old Will had no criminal history, no prior arrests, and no other infractions. He knew that his work under Hwang—in the six months leading up to Archegos's collapse—was a betrayal of the principles on which he was raised. He was determined to turn a new leaf, first by dedicating every ounce of his energy to assisting the Government in any way he could, and second by pursuing a life that he would find fulfilling and would serve a higher purpose. Through these twin goals, Will has worked tirelessly to make amends for the role he played in the Archegos fraud.

### B. *Will's Cooperation Was the Essential Linchpin in the Government's Investigation and Prosecution.*

The information provided by Will was the foundation upon which the Government built its case against Hwang and Halligan. Will offered a full and transparent account of what he knew about Hwang, his associates, and Archegos. The sweeping charges that the Government ultimately brought against Hwang and Halligan—including not only fraud but also charges of racketeering conspiracy and manipulative trading based on a complex web of sophisticated conduct—were made possible by Will's assistance. Will also cooperated with the SEC and CFTC, allowing them to bring related charges and vindicate their regulatory interests in the conduct at issue. During nearly 40 meetings—some of which lasted for an entire day—Will patiently answered every question he was asked and walked investigators through the intricate details of what happened.

Between October 2021, when Will began meeting with the Government, and July 2024, when Hwang and Halligan were convicted at trial, Will provided a wide range of critical assistance. He provided the Government with detailed accounts of Archegos's structure, organization, and operations, including its business and trading strategies, and the roles played by the various employees. He spoke in detail about Archegos's predecessor firm, Tiger Asia, and the players who formed the bedrock of what would become Archegos. Will provided a firsthand account of the culture at Archegos and Hwang's management style. He also shared key insights on many direct conversations he had with Hwang, revealing interactions that were otherwise unknown to the Government and that provided powerful evidence of Hwang's criminal intent.

One of the reasons Will was such a critical witness was that he worked under Hwang for approximately 12 years, starting at Tiger Asia and spanning the entire period from Archegos's formation to its collapse. Trial Tr. 3057. He was privy to certain top-level conversations with Hwang and other Archegos leaders. Trial Tr. 3057–58. Critically, Will was able to explain not

only the events during the six-month period of criminal activity, but also the events that preceded them, starting with the onset of the pandemic in early 2020, allowing the Government to understand the impetus for Hwang's actions.  *See* Trial Tr. 3078–80.

Given Will's familiarity with Archegos's business and trading, he identified for the Government the particular securities—such as IQiyi, TME, Tencent Music, Vipshop, and Viacom—that became the subject of Archegos's manipulative scheme.  Trial Tr. 3080–82.  And Will was able to walk the Government (and eventually the jury) through the discrete steps that Hwang directed Will and others to take to manipulate each one.  For example, Will demystified Hwang's use of various "code words."  *See, e.g.*, Trial Tr. 3100, Trial Tr. 3167–68.  And he explained numerous incriminating text messages, emails, and Bloomberg chats with Hwang. *See, e.g.*, Trial Tr. 3170–72 (text message exchange between Will and Hwang about securing capacity), Trial Tr. 3356–61 (email exchange with Hwang about misleading Goldman Sachs).

Equally important, Will illuminated how Hwang exerted complete control over the firm, instilling a belief in employees that Hwang was a legendary and brilliant investor, and demanding their unerring trust and devotion.  *See* Trial Tr. 3082–83, Trial Tr. 3586, Trial Tr. 3597.  Will showed how Hwang maintained his authority, such as micromanaging trading decisions, screaming at traders who fell short in some way, and heaping praise on those who followed his directives. *Compare* Trial Tr. 3184 (Hwang yelling at Will for not being aggressive enough in trading Viacom stock), Trial Tr. 3187 (at times Hwang "raise[d] his voice and yell[ed] at [the traders] for not being aggressive enough"), *with* Trial Tr. 3111 (Hwang praising Will's "Herculean" effort in holding up a stock's price through intentionally placed trades).

With his cooperation, Will went above and beyond the typical requirements.  He spent hundreds of hours explaining to the Government the details of swap trading, hedging, variation margin, capacity and other technical concepts; and reviewed voluminous Bloomberg documents and trading records, in order to highlight significant transactions and communications.  Will proactively searched for evidence that he understood could be relevant to the Government's investigation.  For instance, he unearthed emails that provided compelling evidence of Hwang's intent to artificially inflate the price of GSX.  *See, e.g.*, Trial Tr. 3276–77 (Hwang Bloomberg messaging his traders to create a price floor for GSX).

### C. *Will Was the Most Important Witness at Trial.*

Will's value as a trial witness cannot be overstated.  The Government brought aggressive and complex charges, accusing Hwang of leading, and Halligan of participating in, a racketeering enterprise through overlapping schemes involving fraud and market manipulation.  Will spent five days testifying on direct examination, and another four-plus days on cross-examination and redirect, spanning more than two weeks of the eight-week trial.  Day after day, he answered the questions that were posed to him, always patient and candid, avoiding any hint of exaggeration or vindictiveness.  By the end of his testimony, it was clear to any observer that Will "proved to be a highly damaging witness to Hwang."  Bob Van Voris & Chris Dolmetsch, *Archegos Trader's Testimony Sets High Stakes for Hwang*, BLOOMBERG NEWS (June 17, 2024), https://www.bloomberg.com/news/articles/2024-06-17/archegos-trader-s-tough-testimony-wipes-smile-from-hwang-s-face.   He gave "a painstaking account of how Hwang orchestrated trades to

goose stocks to certain prices" by, among other things, telling narratives of specific incidents that were "backed up by written communications that were shown to the jury." *Id.*

Will's testimony began with an explanation in plain English of how Archegos's illicit schemes operated. *See* Trial Tr. 3041 ("[W]e traded in large amounts of volume that were effective in literally causing the price of the stocks to go up or down."). He explained, on a mechanical level, how Archegos used technology to execute and monitor trading activity. *See* Trial Tr. 3046. He detailed how traders communicated internally, *see* Trial Tr. 3129 (continuous Zoom chat), Trial Tr. at 3131 (Instant Bloomberg chat); how the traders executed the trades that Hwang directed, *see* Trial Tr. 3049; and even helpfully answered the Court's questions, *see* Trial Tr. 3047–48.

Will provided unique, firsthand insight into Hwang's subjective intentions and motivations. *See, e.g.*, Trial Tr. 5100 (Government's summation: "Hwang directed Tomita to buy and sell stocks to affect stock prices. This is testimony from somebody who worked for Hwang for more than a decade, somebody who sat on a Zoom with him on hours every day for months on end, somebody whose job it was to understand what Hwang wanted, and to get it for him. So when Tomita tells you that Hwang made clear to him that Hwang wanted to, that he intended to manipulate securities prices, that's incredibly powerful evidence that he did."); *see also* Trial Tr. 2938. That is, Will connected the trading activity to explicit directives handed down by Hwang. *See* Trial Tr. 3064, Trial Tr. 3094, Trial Tr. 3051–52 (Hwang directing trading team to avoid purchasing securities in a way that would reveal Archegos's holdings), Trial Tr. 3124–25 (Hwang ordering traders to "time [the] buy" for the close of market to impact the closing price). And he was able to explain technical securities concepts to the jury, which was critical to avoid jurors becoming confused or disengaged. *See, e.g.*, Tr. 3043–45. Will also put these events into context, allowing the jury to understand how the schemes related to broader shifts in the market during the pandemic. *See, e.g.*, Trial. Tr. 3077–83 (explaining Hwang's obsession with specific stocks during the pandemic). Will also identified and authenticated various documents that corroborated his testimony and provided evidence of the schemes. *E.g.*, Trial Tr. 3140. Notably, at no point during the trial did Hwang's or Halligan's counsel impeach Will's testimony or detract from the explanations he provided.

On July 10, 2024, one day after starting deliberations, the jury found Hwang guilty on ten criminal counts for racketeering, fraud and market manipulation and Halligan guilty on three criminal counts for racketeering and fraud. On November 20, 2024, Judge Hellerstein sentenced Hwang to 18 years' imprisonment and subsequently ordered him to pay $9.4 billion in restitution. On January 27, 2025, Judge Hellerstein sentenced Halligan to 8 years' imprisonment and subsequently ordered him to pay $3.1 billion in restitution and $2 billion in forfeiture.

* * *

As extensive and valuable as Will's cooperation was, a sentence without imprisonment is even more imperative when the Court considers how Will has rebuilt his life since 2021.

### III. Will Is a New Person Today, Devoted to Benefiting His Community and Living Up to the Values His Parents Instilled in Him

Following the collapse of Archegos, Will began his life anew. This record speaks volumes about Will's character. It demonstrates that his involvement in the Archegos fraud was an aberration—a serious mistake, for which he bears responsibility, but not a reflection on who he is at his core. It also shows that Will has tremendous potential to contribute meaningfully and productively to society, and that there is no risk of him ever committing another crime.

Will grew up in a suburb of Chicago, Illinois. Trial Tr. 3055. He was raised by his parents alongside his two brothers.[3] Will was close to his brothers growing up and remains so today. Ex. B, Tadaki Tomita Letter, at 1 ("[W]e also shared countless moments of joy and connection . . . . [W]e both carry the same core values our parents instilled in us: integrity, service, compassion, and community."). Will's father was a pediatric surgeon, and his mother at one time worked as a nurse. He grew up in a warm household with a focus on community service, ministry dedication, and education. *See* Ex. C, Kathryn Tomita Letter, at 2. Will described his childhood as "filled with love, structure, opportunity, and strong values." Ex. A, William Tomita Letter, at 5.[4] Will routinely volunteered at homeless shelters when he was growing up and even organized a group of friends and community members to refurbish a homeless shelter as part of his dedication to the Boy Scouts of America, where Will rose to the rank of Eagle Scout.

Will was an intelligent and driven child. He learned Japanese as a second language even though no one in his household was fluent. He studied hard in high school, attended Northwestern University, and graduated with a major in economics and international studies and a minor in Mandarin Chinese. *Id.* After graduation, Will worked for Lehman Brothers in Japan. He did so in part to foster connections with his father's home country. *Id.*

Hwang recruited 24-year-old Will to Tiger Asia as a junior trader. Trial Tr. 3056. Will had no prior trading experience. *Id.* His new job consisted of "listening to the instructions of [Hwang] about what to buy and sell and executing those trades in the market on his behalf." *Id.* at 3057. Hwang's strategy focused on identifying public companies that were underpriced due to the market's overemphasis on short-term earnings. This strategy proved successful, and Tiger Asia was very profitable in its early years.

---

[3] He remains close with his brothers today—one still lives in Illinois and is a cardiovascular surgeon and the other lives in Brooklyn and works as an architect. *See* Ex. B, Tadaki Tomita Letter, at 1; Ex. D, Dan Tomita Letter, at 1.

[4] Despite his generally happy childhood, Will suffered from certain health conditions during his formative years. As a child and adolescent, ▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. C, Kathryn Tomita Letter, at 2. He was also diagnosed with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In 2007, Will suffered a back injury while skiing that left him with ▮▮▮▮▮▮▮▮ and difficulty moving for over a year. A second back injury in 2018 left him with persistent discomfort that he works hard to manage today.

Hwang cultivated an environment in which employees were expected to revere him as an infallible and all-powerful figure—someone entitled to unquestioning respect, loyalty, and deference. Will came to idolize Hwang, viewing him as a mentor and a brilliant investor.

But Will's experience at Tiger Asia was far from ideal. In late 2008, Hwang caused Tiger Asia to trade on material nonpublic information and "reaped [millions of dollars in] illicit profits." *See* Information at ¶ 16, United States v. Tiger Asia Management, LLC, No. 12-cr-808 (D.N.J. Dec. 12, 2012). Tiger Asia pled guilty to federal charges in 2012 and forfeited over $16,000,000, and it subsequently agreed to pay over $44,000,000 to settle charges filed by the SEC. *See* Plea Agreement, United States v. Tiger Asia Management, LLC, No. 12-cr-808 (D.N.J. Dec. 12, 2012); *Hedge Fund Manager to Pay $44 Million for Illegal Trading in Chinese Bank Stocks*, U.S. SEC. EXCH. COMM'N (Dec. 12, 2012), https://www.sec.gov/newsroom/press-releases/2012-2012-264htm. Will was unaware of the impropriety of Hwang's conduct at the time. But he suffered from the stress brought on by Hwang's actions. For instance, Hwang was often visibly frustrated at work and would scream and publicly humiliate his traders, including Will. Will also worked a grueling schedule, typically 12-to-16 hour days, glued to his trading terminal.

As a result, in 2013, Hwang converted Tiger Asia into the Archegos family office, and Will followed him, believing Hwang's pledge to have a compliant business and improve the working conditions. Will also continued to believe deeply in Hwang as a mentor, leader, and investor, despite the challenges of working under him. For instance, Will genuinely believed in the wisdom of Hwang's stock picks, and he made the same investments in his personal portfolio. Trial Tr. 3083:3–9. For a time, working conditions at Archegos did improve, especially with the addition of a new Co-CEO. Ultimately, however, Will found that his experience was, as before, dominated by Hwang. With the benefit of hindsight, it is clear to Will that he should have seen the red flags and left Archegos. But as described above, Will was blinded by a combination of factors, including the pace of the work, his faith in Hwang, and his fear of disappointing him.

Four years ago—following the collapse of Archegos and the FBI raid of his home—Will made a resolution to change his life. Notwithstanding Hwang's attempt to retain control over the situation, Will immediately selected his own counsel long before agreeing to work with the Government. Starting over involved a great deal more than cooperating with the Government. He resigned from Grace & Mercy,[5] severed his ties to Hwang, and left the finance industry behind forever. He took time, and underwent treatment, to really consider what his true passions and interests were, and how he could pursue a new direction combining his genuine interests with a career that positively impacts other people.

Will has long been captivated by art. In the little spare time he had while working at Archegos, he had enjoyed learning about new and emerging artists, discovering lesser-known art galleries, and beginning to acquire works that he believed would appreciate in value over time as the artists became more widely known. He had thought that, one day, owning and running his

---

[5]    Will's wages reported in 2021 included his salary from Grace & Mercy before his resignation. *See* PSR ¶ 169.

own art gallery—including discovering and showcasing artistic talent that he believed others would enjoy—would be a dream job. So that is what Will decided to pursue.

In 2022, he enrolled in a program with Sotheby's Institute of Art to obtain a master's degree in art business, which he earned in December 2023. Will also completed an art appraisal program with the Appraisal Association of America. In January 2025, after many months of preparation, he took a major step toward making his vision a reality, purchasing an art gallery in South Florida together with a partner. Will has poured his heart and soul into this full-time pursuit; seven days a week, he works on email campaigns, managing the website, meeting with artists, and coordinating events and exhibitions. He has already succeeded in attracting one well-regarded New York painter to give a talk at the gallery, and he endeavors to host monthly artist talks by the end of 2025. Will hopes for this gallery to provide an art experience accessible to all members of the community, not just the affluent and those living in major art hubs. Will has already seen this mission bear fruit when one visitor, whose Parkinson's disease had long prevented him from traveling to the galleries in Palm Beach, expressed his appreciation for the ability to see art in his community. If the gallery continues its success, Will hopes to host a non-profit art show for the local community next summer. But for now, the business is still in its nascent stages, and Will has a long way to go to make it a viable business.

Will has also pursued other valuable experiences in the art world over the past four years. One particular focus has been using art to honor communities that are often underrepresented in the art world. Will and his partner with the gallery, John Jahng, hosted a charity art show last year that benefited a nonprofit for children with disabilities. *See* Ex. E, John Jahng Letter, at 2 ("I also had the privilege of working with Will to put together a charity exhibition benefiting Community Inclusion and Development Alliance (CIDA) which serves underrepresented Asian American immigrants with disabilities. He was very generous not only with his time with planning, curating, and project managing the exhibition, but also funding it as well by paying for his own travel expenses and purchasing a work to have the net proceed go to CIDA."). And from 2022 through 2024, Will volunteered with New Wave, an art non-profit that provided living and studio space in Florida exclusively to artists from underrepresented and marginalized backgrounds. He served as the organization's sole on-the-ground operations manager, preparing the space for the artists, coordinating their stays and culminating exhibitions, and serving as the project manager for New Wave's yearly "Art Weekend" fundraiser. *See id*. After years of emotional struggle and professional turmoil, Will has finally found a calling that has reinvigorated his life.

Will has also embraced volunteer work outside the art world. He loves animals and has sought numerous opportunities to contribute to his community through this interest. For example, he volunteered with nonprofits focused on animal rescue and habitat preservation, including Big Dog Ranch Rescue and the Nature Center at John D. MacArthur Beach State Park. *See* Ex. C, Kathy Tomita Letter, at 1 ("He always loved animals, so he found the Big Dog Ranch Rescue training dogs for veterans. He helped on many of their fundraisers . . . the next time I saw Will he was volunteering at the Nature Center. He looked like some of his spirit was coming back. His enthusiasm for helping the sea turtles was infectious and he loved taking people out to watch for nesting turtles."). Spending his free time advocating for animals helped ease some of

the emptiness Will felt from the events at Archegos.[6] *See* PSR ¶ 159 (listing over 1000 hours of charitable services); Ex. F, Tadanori Tomita Letter, at 4 ("He has a deep love for animals . . . [and] has dedicated his time to volunteering at animal shelters and wildlife projects, such as sea turtle nest protection and monitoring in Florida coast every year.").

Will has deep and loving relationships with many friends and family members who care for him and depend on him in their lives. He has worked extremely hard over the past four years to rekindle those relationships. Friends describe him as supportive, kind, unassuming, and thoughtful. *See* Ex. I, PS Letter, at 2. ("For someone so successful at his age, his kindness and generosity in this way meant a lot to me."). His involvement with Archegos's criminal activity shocked everyone in his circle, but his family and friends have seen Will's efforts to rebuild his life and make amends for his wrongdoing. *See* Ex. C, Kathy Tomita Letter, at 3 ("Will has learned a lot about himself since this catastrophic event five years ago, and I have watched that painful growth. As his mother, I'm extremely proud of him for taking responsib[ility] for his part in it and picking himself back up."); Ex. J, Heather Ballard Letter, at 1–2. ("William has . . . shown a genuine commitment to self-reflection and growth. . . . [Will] has volunteered his time to support underserved communities and environmental causes, returned to graduate school, and launched a new career dedicated to supporting independent artists."). Will has always been known as a warm and kind individual by friends and strangers alike. *See, e.g.*, Ex. J, Heather Ballard Letter, at 1 (describing the "depth of William's loyalty and generosity"); Ex. G, Anonymous Letter. Will's record of personal growth over the past four years makes clear that a term of imprisonment is not necessary or appropriate. He is making amends for his mistakes, contributing to his community, investing in personal relationships, and returning to the values of integrity and honest hard work instilled in him by his parents. He presents no risk of further criminal activity.

### IV. A Non-Custodial Sentence Would Satisfy All of the Section 3553(a) Sentencing Factors

As the Court knows, the familiar sentencing factors under 18 U.S.C. § 3553(a) include the "nature and circumstances of the offense and the history and characteristics of the defendant," the need to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," the need "to afford adequate deterrence" and "to protect the public from further crimes of the defendant," and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Here, a sentence without imprisonment is more than sufficient to satisfy each of these factors.

**The nature and circumstances of the offense.** Will participated in serious federal crimes, which caused real harm to many people. But as discussed above, context is critical. *See*

---

[6] Tomita had also volunteered with many organizations prior to the conduct at issue in this case. For example, he volunteered as an umpire at the Special Olympics, *see* Ex. G, Anonymous Letter, at 1, and separately volunteered with the Exodus Transitional Community in 2018 and 2019, assisting formerly incarcerated individuals with reintegration into the community, *see* Ex. H, Peter DeSanto Letter, at 2; *see also* www.etcny.org.

*supra* Part I.  Will did not knowingly join a criminal organization.  Hwang devised the criminal schemes and directed every step that Will took.  A fair evaluation of the nature and circumstances of the offense must balance Will's role in the misconduct alongside the fact of Will's early acceptance of responsibility and the extent of his cooperation.  As the Government describes in their submission, Will has gone above and beyond his commitment to provide substantial assistance.  *See supra* Part II.  Without Will, it is doubtful the Government could have charged Hwang—certainly not with the full scope of his misconduct—and even more unlikely that Hwang would have been convicted at trial.  *See supra* Sections II.B–C.  In light of Will's extraordinary cooperation, a non-custodial sentence is entirely appropriate to reflect the nature and circumstances of his offense.

**The need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**  The sentences imposed on Hwang and Halligan convey to the public the seriousness of the criminal conduct and, accordingly, promote respect for the law.  But as to Will, this factor weighs strongly in favor of a non-custodial sentence.  Such a sentence would promote respect for the law by recognizing the pivotal role Will played as a cooperator in assisting the authorities with investigating and prosecuting the Archegos fraud.  *See supra* Part II.  Nor is a term of imprisonment necessary to provide just punishment given both the extent of Will's cooperation and his record of personal growth and development over the past four years, as discussed above.  *See supra* Parts II–III.

**The history and characteristics of the defendant.**  Will never came close to committing a crime prior to the events in this case.  He had lived an ethical and hard-working life—a literal Eagle Scout.  *See supra* p. 11.  His involvement in the Archegos fraud was a serious mistake but neither defines Will nor reflects who he is as a person.  As detailed above, Will has worked incredibly hard to turn his life around over the past four years.  *See supra* Part III.  His letter to the Court speaks volumes about how far he has come in this personal journey.  *See* Ex. A, Will Tomita Letter.

The man who comes before Your Honor for sentencing bears no resemblance to the former Head Trader of Archegos.  He is deeply thoughtful about what led him to participate in the crimes at Archegos and the values he sacrificed.  He is focused on what really matters—the importance of family and friends, of acting with integrity, and of working hard in a field that makes a positive impact on other people.  Will's history and characteristics reveal a 42-year-old with immense promise to lead a productive and valuable life.  Sending him to prison would serve no useful purpose.

**The need to afford adequate deterrence and to protect the public from further crimes of the defendant.**  Will presents an extremely low risk of ever committing another crime.  As discussed above, he never engaged in criminal activity prior to the events of this case; his misconduct here was directly attributable to his toxic relationship with Hwang, which has been permanently severed; he is deeply remorseful for the harm he caused; and his actions and decisions over the past four years—both cooperating with the Government and transforming his life on a personal level—demonstrate that he is committed to living a life of integrity.  *See supra* pp. 2–3, 8, and Parts II–III.  A term of imprisonment is not needed to deter Will from further criminal activity or to protect the public.

**The need to avoid unwarranted sentence disparities.** A sentence without imprisonment would be fully consistent with sentences imposed by judges in this District and the Eastern District of New York on defendants who have cooperated in complex white-collar cases. *See, e.g.*, Sentencing Tr. at 18–20, 22, United States v. Han, No. 23-cr-00048-EK (E.D.N.Y. Apr. 8, 2025), Dkt. No. 43 (sentencing to time served defendant whose "exemplary" cooperation was "immediate, complete, [and] carried out at significant cost" and which helped secure 10-year sentence for "charismatic" CEO's "very serious large-scale long-duration securities fraud"); Sentencing Tr. at 18–20, United States v. Horowitz, No. 19-cr-861 (ER) (S.D.N.Y. Dec. 1, 2023), Dkt. No. 45 (ordering noncustodial sentence for CFO who cooperated in securities fraud prosecution); Sentencing Tr. 3–4, 17, United States v. Alloni, No. 18 Cr. 350 (GBD) (S.D.N.Y. Aug. 7, 2023), Dkt. No. 41 (sentencing defendant to time served after assistance in FCPA prosecution resulted in a corporate plea and over $700 million in penalties); Sentencing Tr. at 2–3, United States v. Yagami, No. 14-cr-272 (JSR) (S.D.N.Y. Apr. 20, 2017), Dkt. No. 288 (sentencing defendant to time served due to his "genuine remorse," "the fact that he was the first person . . . to enter a guilty plea," and "because his cooperation has been very substantial" in securing guilty pleas in Libor-manipulation fraud prosecution); Sentencing Tr. at 23, United States v. Higgs, No. 1:12-cr-88-AJN (S.D.N.Y. July 1, 2014), Dkt. No. 30 (defendant was "culpable in the serious scheme" but "acquiesced to his boss's instructions," and his "very substantial assistance" helped secure conviction for fraud hiding of $100 million in mortgage-backed security losses); Judgment, United States v. Kumar, No. 10-cr-13-01 (DC) (S.D.N.Y. July 20, 2012), Dkt. No. 50 (issuing non-custodial sentence for cooperating witness in Raj Rajaratnam prosecution); Estelle Atkinson, *"Tuna Bonds" Witness Avoids Prison Time*, GLOB. INVESTIGATIONS REV. (Mar. 6, 2025), https://globalinvestigationsreview.com/just-anti-corruption/article/tuna-bonds-witness-avoids-prison-time (sentencing defendant to time served for wire fraud conspiracy—despite 121–151 month guidelines range—for "exemplary cooperation" and testimony in two trials that resulted in conviction and 8.5-year sentence for principal co-defendant) (citing *United States v. Pearse*, No. 18-cr-681 (NGG) (E.D.N.Y. 2025)); Jack Newsham, *No Jail For Swiss Banker Who Helped Americans Dodge Taxes*, LAW360 (June 21, 2018), https://www.law360.com/articles/1056216/no-jail-for-swiss-banker-who-helped-americans-dodge-taxes (noting that defendant's crime "was a serious one" but sentencing to time served after cooperation resulted in $547 million dollar settlement from Swiss bank) (citing *United States v. Casadei*, 1:11-cr-00866 (LTS) (S.D.N.Y. 2018)).

A non-custodial sentence is particularly appropriate for Will in light of the fact that Your Honor imposed such a sentence on Scott Becker, the other cooperating defendant in this case. The considerations that warranted a non-custodial sentence for Becker apply with equal (if not greater) force as to Will. Your Honor observed that Becker's "trial testimony was deemed essential" and "extremely valuable in indicting and convicting Hwang and Halligan, particularly in helping the government to understand the means and methods of the Archegos enterprise and piece together the timeline of the scheme." Sent'g Tr. at 32:14–18, United States v. Becker, No. 22-cr-231 (LTS) (S.D.N.Y. Sep. 3, 2025). Your Honor also found that Becker "accepted full responsibility from his first proffer," meeting with the Government "upwards of two dozen" times, *id.* at 32:21–33:2; "risked serious personal and professional consequences" from testifying against Hwang and Halligan, *id.* at 33:3–12; and rebuilt his life in the aftermath of Archegos's collapse, *id.* at 35:5–25. As the Court noted, "custody is not necessary to protect the public" from Becker given the low chance of recidivism. *Id.* at 38:18–23. The exact same

considerations fully support a non-custodial sentence for Will. As discussed above, Will met with the Government nearly 40 times; was the most important witness at trial; immediately took responsibility for his actions upon meeting with the Government; accepted significant personal and professional consequences from cooperating and testifying against Hwang and Halligan; and has completely transformed his life, posing no risk of further criminal activity.

Further, a non-custodial sentence here would reinforce a powerful message to the public: that quickly accepting responsibility and committing to tell the truth and assist the authorities can yield significant benefits. In white-collar cases, such cooperation is particularly vital because the most culpable actors are often sophisticated and avoid leaving an incriminating documentary record. The Government therefore depends on cooperators like Will, who can testify to their firsthand interactions with the more senior members of a conspiracy.

Bernard Madoff's case provides an apt comparison. In May 2015, Your Honor sentenced David Friehling—the longtime accountant to Madoff—to a non-custodial sentence (two years of supervised release, including one year of home detention). *See* Order Dated May 28, 2015, United States v. Friehling, No. 09-cr-700-LTS (S.D.N.Y. 2009). Your Honor noted that the sentence was warranted based on Friehling's extensive cooperation, as well as his lack of involvement in the full extent of Madoff's criminal conduct. *See* Sent'g Tr. at 39:12–18, 40:19–41:19, United States v. Friehling, No. 09-cr-700-LTS (S.D.N.Y. June 8, 2015). Other associates of Madoff, David Kugel and Enrica Cotellessa-Pitz, also received non-custodial sentences due in part to their early cooperation with the Government. The Court observed that Kugel and Cotellessa-Pitz had engaged in criminal conduct at the direction of a powerful and influential boss who demanded loyalty; that their cooperation was essential to the Government's efforts to hold Madoff accountable; and that they deserved a second chance given their cooperation and genuine remorse. *See* Sent'g Tr. at 42–46, 50–51, United States v. Kugel, No. 10-cr-228 (LTS) (S.D.N.Y. June 19, 2015), Dkt. No. 1373; Sent'g Tr. at 43–47, United States v. Cotellessa-Pitz, No. 10-cr-228 (LTS) (S.D.N.Y. June 18, 2015), Dkt. No. 1366. These exact same considerations warrant a non-custodial sentence for Will.

Hon. Laura Taylor Swain                        18                        October 7, 2025

\* \* \*

Weighing the Section 3553(a) factors leads to only one conclusion—that a term of imprisonment is not warranted here. Indeed, Will has earned a non-custodial sentence through his exemplary cooperation and his efforts to turn around his life after years of emotional abuse under Hwang.

Respectfully submitted,

*/s/ Helen V. Cantwell*
Helen V. Cantwell
Douglas S. Zolkind
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Phone: (212) 909-6000
hcantwell@debevoise.com
dzolkind@debevoise.com

*Attorneys for William Tomita*

Enclosures

Cc:    AUSA Alexandra Rothman (by e-mail)
        AUSA Andrew Thomas (by e-mail)
        United States Probation Officer Johnny Y. Kim (by e-mail)