

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 14, 2025

**BY ECF**

The Honorable Laura Taylor Swain
Chief United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

  Re: *United States v. William Tomita*, S1 22 Cr. 231 (LTS)

Dear Chief Judge Swain:

  The Government respectfully submits this letter to advise the Court of the extraordinary assistance that William Tomita has rendered to the Government. Tomita substantially aided the investigation and prosecution of individuals involved in the crimes at Archegos Capital Management. Those crimes ultimately inflicted billions of losses on banks and innocent investors and represent one of the largest securities fraud schemes in history. Although Tomita himself played a significant role in this criminal conduct, his acceptance of responsibility and his cooperation during the investigation and prosecution of this matter has been exceptional in every respect, and the Court should accord his assistance significant weight in determining a just sentence. Accordingly, in light of the facts described below, and assuming that Tomita continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Tomita in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

**I. Background and Criminal Conduct**

  **A. Personal Background and Tiger Asia**

  Tomita grew up in the northern suburbs of Chicago and attended Northwestern University, where he focused on economics and international studies. (Trial Tr. 3055 (Tomita)). After graduating from college, Tomita moved to Japan to work on the equity swaps desk and stock loan desk at the investment bank Lehman Brothers. (Trial Tr. 3055 (Tomita)). In 2008, when Tomita was 24 years old and after he had worked at Lehman Brothers for approximately a year and a half, he was approached by the head trader of the hedge fund Tiger Asia, Ray Park, about joining the firm. (Trial Tr. 3056 (Tomita); 3502-008 at 7).

  Tiger Asia was a New York-based hedge fund, focused primarily on Asian stocks, founded by Sung Kook (Bill) Hwang, who was also the chief investment officer and made all investment decisions. (Trial Tr. 3056 (Tomita); 3502-008 at 7). Soon after being approached by Park, Tomita

relocated to New York to work as a junior trader at Tiger Asia, and he learned how to trade securities and derivatives from Hwang and Park, which effectively meant to execute the trades directed by Hwang. (Trial Tr. 3056-57 (Tomita)). Though Tomita had spent time at an investment bank, he had never previously worked at a hedge fund, and he relied on Hwang and Park to teach him.

In 2008, Hwang lost approximately $2 billion of investor funds on a large short position in Volkswagen, the European car manufacturer. In the aftermath of that loss, Hwang turned to fraud, including market manipulation and insider trading, that—at least temporarily—enabled him to demonstrate gains to his investors. As relevant here, Hwang, in order to compensate for his losses by inflating the value of Tiger Asia's portfolio before reporting results to investors, directed Tomita to "mark the close," that is, to manipulate the market prices of securities by placing large trades in the final moments of the trading day in an effort to achieve an artificially high closing price and thereby to inflate the value of Tiger Asia's positions as measured by that closing price, and to trade based on confidential knowledge that certain banks would be selling large blocks of stock.

Hwang effected his manipulative trading at this time largely through Park who, in turn, gave specific instructions to Tomita. At one point Tomita asked Park, in substance, whether such trades were proper, and Park responded that Park had the same question, but that Hwang had told Park, in substance, that the trades were okay and should proceed. Park also explained to Tomita that these trades helped Hwang save face with his investors. With little professional experience and few colleagues at Tiger Asia, what Tomita understood about the trading he learned from Park.

Aa a result of Hwang's conduct, the Securities and Exchange Commission filed a complaint against Hwang alleging, among other things, that he manipulated the market using these open-market trades (GX 2708), and the U.S. Attorney's Office for the District of New Jersey prosecuted Tiger Asia for the same conduct. As to the SEC suit, Hwang entered into a no-admit, no-deny settlement with the Securities and Exchange Commission on the insider trading and market manipulation conduct and accepted a multi-year bar from managing outside investments. As to the criminal case, Tiger Asia pled guilty to an information charging one count of wire fraud. Tiger Asia also entered into a settlement with a Hong Kong regulator, acknowledging in a stipulation of fact, through counsel that, "Hwang and Park . . . engaged in false trading within the meaning [of Hong Kong law]" when "Park carried out and instructed Tomita to assist him to carry out [certain trades] on 6 January 2009 with the intention of creating a false or misleading appearance with the respect to the market for, or the price for dealings in," a specific security. (GX 2706). Neither the U.S. Attorney's Office for the District of New Jersey nor the SEC brought any action against Tomita, and the Hong Kong regulator concluded that Tomita had not engaged in any wrongdoing, noting that "at all material times he had been a junior member of staff, acting always on the instructions of Bill Hwang and/or Raymond Park." (GX 2706).

In the aftermath of the felony conviction and the SEC order, Hwang returned outside investor money, changed Tiger Asia's name to "Archegos," and committed to operate Archegos as a "family office" that managed Hwang's wealth. (Tomita PSR ¶¶ 127-28). Tomita continued to work for Hwang as a trader after the conversion of Tiger Asia to Archegos and continued to report to Park.

## B. The Archegos Enterprise

In the years following its transition to a family office, Archegos continued to be Hwang's business. If anything, Hwang's control increased because the money managed ultimately belonged to Hwang, no outside investors needed to be updated or consulted, and Hwang stood to benefit from any increase in value of the portfolio. (*E.g.*, Trial Tr. 3057 (Tomita)). Hwang remained the ultimate authority on any matter he took an interest in; Hwang continued participating in the stock markets with no meaningful oversight by Archegos's compliance personnel, who, for the most part, policed the personal trading of the firm's analysts; and Hwang continued to be supported by the same senior people who had enabled him at Tiger Asia, including Chief Financial Officer Patrick Halligan, Director of Risk Management Scott Becker, and Tomita, who became the head trader after Park stopped working in 2014. (*See* Trial Tr. 3057 (Tomita)).

For years, Archegos rarely engaged in much trading at all. Hwang spent most of his time and attention with his analysts, reviewing and debating the merits of various investments from the approach of a long-term value investor. When Hwang did decide to invest, he typically instructed traders to establish a position by buying or selling stock or derivatives and then left the position alone. As a result, Tomita and the other traders did not trade frequently, and, with the exception of a few periods of market turmoil, his job as a trader was neither eventful nor demanding. Hwang did, however, impress upon Tomita and the other traders that he expected secrecy in conducting the firm's business. Hwang instructed Tomita to disclose very little about Archegos's trading to counterparties, for example, and even directed Tomita on occasion to keep certain information from his colleagues at Archegos.

Things fundamentally changed in 2020. At Hwang's direction, Hwang, Halligan, Becker, and Tomita pursued two interrelated criminal schemes, one involving manipulative trading in the marketplace, and the other involving false and misleading statements to Archegos's trading counterparties. The schemes picked up in the months that followed the start of the COVID-19 pandemic. (Tomita PSR ¶¶ 43-45). Archegos's portfolio, which had been worth approximately $2.7 billion at the end of February 2020, fell to less than $1.5 billion by March 12, 2020, as the U.S. markets declined and lockdowns began. Hwang, however, soon began to talk about not being afraid of a "war scare" and the need to "play offense." (*See, e.g.*, GX 235).

As with many organizations, COVID-19 shifted Archegos's workplace and routines. Employees left the office. Remote work became the norm. Soon, Hwang took to working in a Central Park apartment leased by Grace & Mercy, his foundation, with one analyst and no senior executives. (Trial Tr. 619 (Jones)). In the months that followed, Hwang became obsessed with trading, and specifically with using his trading power to influence the prices of the stocks that underlay his positions. By autumn, Hwang spent much of every day on a continuous Zoom with his traders and on a parallel Instant Bloomberg chat, dictating trade orders down to limit prices and timing. At times, Hwang would "raise his voice and yell at [the traders] for not being aggressive enough." (Trial Tr. 3187 (Tomita)). Archegos continued to hold itself out as an investor focused on company fundamentals with a three- to five-year investment horizon, but Hwang in truth spent his time—and nearly all the firm's capital—on constant trading in the same core names. Hwang began deploying strategies aimed to manipulate, control, and artificially affect the market for securities in Archegos's portfolio, including techniques he had used at Tiger Asia. (Tomita PSR ¶¶ 48-50). These techniques included purchasing or selling securities at particular, strategic times

of day; transacting in certain securities in large amounts or high volume; and timing or coordinating certain transactions to maximize impact on the market. (Tomita PSR ¶ 60). Indeed, as Tomita explained, Hwang instructed Tomita and the other traders to minimize the stocks actually purchased (or sold) but to trade in a manner that maximized the impact of their trading on the market prices for the securities. (Trial Tr. 3042 (Tomita)).

Hwang found that his trading could pay for itself. Based on the margin rules in place at the time, daily price moves would typically result in a change in how much margin Archegos owed the bank or, conversely, the bank owed Archegos. For the stocks where Hwang bet the prices would go up, a daily price increase would mean that variation margin moved in his favor, too, permitting him to access more cash. (Tomita PSR ¶ 63). Hwang took that cash and used it to fund additional buying, further driving up the prices of the stocks, and thus freeing up still more cash. (Trial Tr. 3040-41 (Tomita)). As position sizes—and thus margin impact—grew over 2020 and into 2021, the margin framework became both an engine for fraud and a liability: a decrease in prices would trigger a margin call and potentially threaten to unwind the price inflation Hwang had achieved. To avoid this, Hwang began to focus much of Archegos's trading at the end of day, in large sizes and in relatively outsized proportions of the market. (*E.g.*, Trial Tr. 2834-40 (Battalio)).

Tomita meaningfully contributed to this scheme. While Hwang directed all of the trading, it fell to Tomita, as head trader, to execute the trades ordered by Hwang and to manage and supervise a team of three other traders, who also executed trades pursuant to Hwang's orders. (Trial Tr. 3058 (Tomita)). Indeed, Tomita recalled that, even though Hwang's earlier trading instructions may have been designed to artificially affect market prices, Hwang began explicitly directing Tomita to engage in manipulative trading on October 21, 2020. (Trial Tr. 3084 (Tomita)). In response to a large sell-off in the stock of a company in which Hwang had previously taken a very large position, Hwang, in an effort to stave off losses to the value of his portfolio and resultant margin calls by Archegos's counterparties, directed Tomita to trade in a manner to prevent the price of the securities of that company and other companies in Archegos's portfolio from declining at the end of the trading day. (Trial Tr. 3084-102 (Tomita)). Hwang later complemented Tomita for his "Herculean" defense—that is, successfully trading in a manner that controlled the price of the securities in which Archegos had invested. (Trial Tr. 3111 (Tomita)). Following that event, Hwang directed Tomita and the other traders to manipulate the prices of stocks in Archegos portfolio until Archegos imploded in March 2021. (Trial Tr. 3125-26 (Tomita)).

Notably, during this period, all in service of maintaining this trading scheme, Hwang forced Tomita and his traders to work grueling schedules and was frequently abusive. Hwang would often yell at the traders and prevent them from taking breaks, even to use the restroom. (Trial Tr. 3136 (Tomita)). In one notable instance, a trader took a break to use the bathroom, during which time the order that Hwang had directed in an effort control the price of a stock stopped executing, causing the price to move in a manner that Hwang did not want. (Trial Tr. 3163 (Tomita)). In response, Hwang yelled at the traders and discouraged them from using the bathroom again while working. (Trial Tr. 3164 (Tomita)). And generally, when the traders failed to keep a stock at a particular price or to move to the price that Hwang desired, he would yell or glare to intimidate them. (*See* Trial Tr. 3187-88 (Tomita)). Hwang's demands for intense and total responsiveness from his trading team marked a fundamental shift from the relatively sleepy and episodic trading that had occurred in the years prior to the pandemic.

Hwang's trading schemes were sustained and furthered by lies and misrepresentations made to Archegos's counterparties. As Hwang's trading led to large position sizes, Archegos encountered risk, capacity, and margin lending limits at its counterparties. To enable Hwang to continue to trade the same names at larger sizes, Halligan, Tomita, Becker, and others repeatedly made to Archegos's counterparties materially false and misleading statements about Archegos's overall portfolio of securities (that is, the positions that Archegos had at other counterparties, which the given counterparty could not see). (Tomita PSR ¶ 75). Those misrepresentations generally fell into three categories: (i) misrepresentations regarding the concentration of Archegos's positions; (ii) misrepresentations regarding the liquidity of Archegos's positions; and (iii) misrepresentations regarding the composition of Archegos's portfolio. These false and misleading statements were designed to fraudulently induce the counterparties into trading with and extending credit to Archegos, enabling and facilitating the market manipulation scheme, and to hide the true risk of doing business with Archegos. (Tomita PSR ¶ 75).

For his part, Tomita, to further Hwang's scheme, directly lied to representatives of Archegos's counterparties in order to conceal the riskiness of Archegos's portfolio and the quantity of Archegos's exposure (that is, the amount of a company's stock Archegos owned or was short) through equity and swap. (Trial Tr. 3052 (Tomita)). Indeed, among Tomita's responsibilities was to manage the senior-level relationships with Archegos's counterparties. (Trial Tr. 3058 (Tomita)). As part of his work liaising with Archegos's counterparties, Tomita misled them on numerous occasions about the nature of Archegos's portfolio during 2020 and 2021. To take one example, in February 2021, to obtain additional trading capacity from a particular counterparty, during a call that was recorded by that counterparty Tomita made false and misleading statements regarding the total exposure that Archegos had to a particular company, leading that counterparty to believe that Archegos's total position was much smaller, and therefore much less risky, than it was. (Trial Tr. 3402-08 (Tomita)). Tomita, at Hwang's direction, made numerous similar misrepresentations to other counterparties, discussed Becker making similar misrepresentations with Becker and Halligan, and observed Hwang make misrepresentations to counterparties.[1]

Hwang further accomplished his manipulative trading by structuring it to avoid any public reporting requirements that would reveal Archegos's concentration. Most significantly, Hwang used derivatives known as total return swaps that, unlike traditional equity securities, did not have a public reporting requirement. (Tomita PSR ¶¶ 31-34). The Archegos conspirators, however, treated their swaps as the functional equivalent of purchasing or selling the equity itself. To trade swaps at all, Archegos understood that its counterparties would first buy or sell a corresponding security in the market to price and hedge the swap for Archegos. In fact, Archegos in most circumstances electronically instructed the counterparty on how it should buy or sell the stock that would underlie the swap. Accordingly, Hwang and the traders could and did place orders for swaps and then get "instantaneous feedback" as their orders hit the equities markets. (Trial Tr. 3046

---

[1] Halligan had been misleading Archegos's counterparties for years and had trained and instructed Becker to do the same. Until Hwang's trading scheme developed in 2020, these lies to the counterparties do not appear to have involved, or to have been known to, Tomita and the other traders.

(Tomita)). And they also followed along as their counterparties became the top holders of the equities underlying their swaps.

Hwang's trading strategies and use of multiple counterparties led market participants to believe that the prices of those stocks were the product of natural forces of supply and demand when, in fact, they were the artificial product of Hwang's manipulative trading and deceptive conduct that caused trading by others.

### C. Archegos's Collapse

By March 2021, Hwang's manipulative trading scheme—which relied in part on continually increasing the size of Archegos's positions in a handful of equities—had profoundly reshaped Archegos's portfolio and risk profile. Though Archegos often had concentrated positions in the past, those positions typically had been in highly liquid stocks, such as Amazon or Netflix. (*See* Tomita PSR ¶ 42). Now Archegos had concentrated its investments in a grab bag of stocks with markets that Hwang found he could distort, including ViacomCBS, Discovery, and VIPS. Archegos's internal reporting estimated that it would take months to unwind these positions without crashing the markets. (GX 962A). At the same time, individual counterparty banks began charging higher margin rates because even the slices of the Archegos portfolio they could see appeared to be large and concentrated in a handful of names. Because it was essential to the scheme to continue buying the same stocks, Archegos was forced to do so at margin rates of 30%, 50%, and even 100%. (*E.g.*, Trial Tr. 3462 (Tomita)). The combined effect of these trends was that Archegos's portfolio became highly vulnerable to external events that might deflate the artificial prices Hwang had created, and Archegos was sapped of the liquidity or cash to respond to such a development.

Hwang began to explore ways to extract money from his scheme. Among other things, he investigated block sales. He considered advocating for corporate takeovers, such as convincing Apple to acquire Viacom. But he did not act quickly enough. In late March 2021, the markets exposed Hwang's price manipulation. On March 22, 2021, ViacomCBS announced a seasoned equity offering. (Tomita PSR ¶ 90). Immediately, the conspirators perceived that the announcement threatened to unwind their work by depressing the prices of Viacom stock. Halligan, for example, remarked, "get ready for a ride" (GX 3745), and the traders prepared for a wild trading day. What followed was a brazen attempt to overpower the markets: On March 23, Hwang directed nearly a billion dollars in additional Viacom purchases, even as Halligan, Becker, and Tomita acknowledged that the firm may not have the cash to cover the trading. (Tomita PSR ¶ 91). When the day ended, the conspirators understood that the following day the firm would face margin calls it could not meet. The problems compounded on March 24, 2021, when the SEC announced new disclosure requirements that would apply to some of the foreign issuers in Archegos's portfolio, which had the effect of further depressing their stock price. On March 24, 2021, using what cash and capacity remained, Hwang made one final attempt to reverse market forces, but he failed. (Tomita PSR ¶ 92). As he did so, Halligan and Becker strategized about how best to ignore and mislead counterparties that were inquiring about the situation. ((Tomita PSR ¶ 95). When the markets closed, Archegos faced substantial margin calls that it could not meet.

Archegos's senior executives pleaded with the firm's counterparties for more time to meet the margin calls. In a series of late-night phone calls seeking forbearance, Archegos asserted that

it faced a "liquidity" problem, not a "solvency" problem, and that its portfolio comprised "household names" that it knew well. (*E.g.*, GX 2537). But Archegos refused to provide the banks with specific details about its positions or its plan to unwind positions to cover the margin calls. As the situation became dire, Hwang himself addressed the banks. During a March 25, 2021 phone call, Hwang falsely described Archegos's portfolio by misrepresenting the liquidity of its top names and how long it would take to unwind its positions. (GX 2504). Soon thereafter, however, the counterparties lost patience and declared a default. In the following days, the counterparties sold the stocks they held in connection with their agreements with Archegos. The prices that had been artificially supported by the trading directed by Hwang, and funded by lies told to the counterparties, collapsed. More than $100 billion in apparent market value for nearly a dozen companies disappeared within a matter of days. (Tomita PSR ¶ 96).

Ultimately, the market manipulation and fraud schemes, and the billions of dollars in losses that they caused, victimized a wide swath of market participants, including banks and prime brokers that engaged in loans and securities trading with Archegos based on lies and deceit, ordinary investors who purchased and sold the relevant securities at artificial prices, and securities issuers who made business decisions based on the artificial prices of their stocks. The schemes also caused millions of dollars of losses to innocent Archegos employees who had been required to allocate to Archegos a substantial amount of their pay as deferred compensation.

## II. Tomita's Cooperation

### A. Initial Cooperation

Following the collapse of Archegos, Hwang hired Tomita to continue working for him at Hwang's foundation, Grace & Mercy, at an annual salary of $400,000 plus bonus, which was commensurate with his previous compensation at Archegos. (Trial Tr. 3580-81 (Tomita)). Tomita was given the title of head trader, though there was no actual work to perform as head trader after Tomita unwound the positions that Grace & Mercy had held to generate cash. (Trial Tr. 3581-82 (Tomita)).

Later in 2021, agents with the Federal Bureau of Investigation executed a search warrant at Tomita's residence, and within days, Tomita had decided to cooperate with the Government's investigation. (Trial Tr. 3582-83 (Tomita)). Indeed, in the days prior to the FBI's appearance, Tomita had received a compliance document at Grace & Mercy, which described the illegality of the very types of conduct he had undertaken at Hwang's direction while at Archegos. That document made Tomita realize, even before the FBI knocked on his door, that "these things weren't just going to go away," that he "had been in so much pain the months prior because of [his] behavior and what [he] had done," and that he "couldn't do that anymore" and "needed to acknowledge it, and just be open and embrace that behavior." (Trial Tr. 3583-84 (Tomita)). For that reason, "when the government showed up to [his] door, it just felt very natural and cathartic to be able to go in and just admit and talk about all the behavior and the things [he] had done." (Trial Tr. 3584 (Tomita)).

In the months that followed, Tomita met frequently with the Government. Over the course of numerous proffer sessions, Tomita spoke openly about his involvement in the market manipulation and fraud schemes, and expressed intense remorse for his actions, often being

reduced to tears over the guilt he felt for having misled colleagues at Archegos's counterparties, and causing substantial harm not only to them, but also to Archegos employees who were relying on money that was effectively tied to Hwang's investments, and to untold numbers of innocent investors in the marketplace. From the outset, Tomita demonstrated a firm commitment to accepting responsibility for his misconduct and answering the Government's questions candidly. Tomita spoke truthfully and carefully about his interactions with Hwang, Halligan, Becker, and others at Archegos. Indeed, Tomita spoke truthfully regarding his interactions with Hwang in particular—despite what had been a close relationship with the man who had hired, trained him, and spent much of the pandemic interacting with him constantly, but Tomita also did not attempt to embellish anyone's role, portray anyone in an unfair or inaccurate light, or to inculpate anyone unfairly in an effort to curry favor. To the contrary, Tomita was precise about what Hwang had and had not told him, and frequently blamed himself and took responsibility, particularly for the involvement of the other traders, whom he had tried to protect from Hwang.

Tomita also spent hours walking the Government through thousands of pages of dense chats written in trader jargon and shorthand so that the case could be precisely and accurately presented, and spent even more time on his own, doing his best to reconstruct carefully how the scheme had operated and what he had been instructed to do. Tomita also provided the Government with pictures and records of his own—all of which corroborated his own involvement in the criminal conduct—that the Government would not otherwise have acquired, including, notably, screenshots that Tomita had saved of Zoom calls among Hwang and the traders, and Hwang and others at Archegos and counterparties, all of which documented, as Tomita explained, one of the largest frauds in the history of Wall Street. Tomita took seriously his obligation to provide a truthful account of the events that had transpired, and he did so unflinchingly.

### B. Tomita's Guilty Plea

On April 22, 2022, Tomita pled guilty to a five-count information pursuant to a cooperation agreement. Specifically, Tomita pled guilty to racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); two counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; market manipulation, in violation of 15 U.S.C. §§ 78i(a)(2) and 78ff, and 18 U.S.C. § 2; and wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. This guilty plea exposed Tomita to a maximum term of incarceration of 100 years.

### C. Tomita's Trial Testimony

Tomita testified extensively at trial against Hwang and Halligan. Indeed, Tomita was on the stand across nine trial days, approximately five of which were spent on cross-examination. There can be no question that Tomita's testimony—the only direct testimony about the market manipulation—was critically important, nor that Tomita testified carefully, openly, and honestly throughout. Indeed, through a lengthy, tiring, and often emotional and personal cross-examination, Tomita maintained his focus on testifying fairly and accurately, speaking clearly about his own, Hwang's, and Halligan's conduct, but also never straying beyond what he knew or seeking to cast anyone in an unfair light or go beyond the precise facts as he recalled them. At the conclusion of trial, Hwang was convicted of racketeering conspiracy, two counts of securities fraud, and six of seven counts of market manipulation (the jury returned a verdict of not guilty with respect to the

manipulation of one of seven particular stocks), and one count of wire fraud. Halligan was found guilty of racketeering conspiracy, securities fraud, and wire fraud.

### III. The Presentence Investigation Report and the Applicable Guidelines Range

The U.S. Probation Office prepared a presentence investigation report, finalized on September 19, 2025. Probation computes an offense level of 36, a criminal history category of I, and a Guideline sentencing range of 188 to 235 months' imprisonment. (Tomita PSR ¶¶ 126, 135, 188). Probation recommends a time-served sentence based on, among other things, (i) Hwang's influence and dominating role in the criminal conduct; (ii) Tomita's status as a first-time offender; (iii) Tomita's post-Archegos life changes; (iv) Tomita's expression of remorse; and (v) Tomita's assistance to the Government. (Tomita PSR at 50-51).

### IV. The Guidelines and the 3553(a) Sentencing Factors

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

Here, the Government agrees that Probation has accurately computed the Guidelines sentencing range to be 188 to 235 months. (Tomita PSR ¶¶ 126, 135, 188).

Tomita's submission identifies numerous reasons that the Guidelines range produces a sentence much greater than necessary to achieve the purposes of sentencing. (*See* Tomita Sentencing Submission 11-17). From its perspective, the Government underscores three

dimensions to Tomita's role that merit consideration in the Court's assessment of the Section 3553(a) factors:

First, Tomita's conduct in 2020 and 2021 arose in a cult-like atmosphere where one dominating personality had largely shaped and controlled Tomita's professional development for more than a decade. By the time Tomita joined Tiger Asia, Hwang was already a legendary fund manager and giant on Wall Street. Tomita, by contrast, was a 24-year-old with little work experience. Unlike most ordinary businesses, Tiger Asia and Archegos were organized to serve the whims of one person. Further, Hwang built Archegos to be secretive and siloed from other financial firms and often hired relatively junior employees, creating a firm whose employees were dependent upon Hwang alone for their understanding of industry norms. At times Hwang even inserted his personal religious beliefs into the firm's operations by using Archegos staff to advance the work of his foundation and by encouraging his subordinates to attend religious functions that he led, like bible readings. As a result, Archegos became a place where the pay, professional purpose, and even spiritual life of its employees began to revolve around Hwang.

Hwang abused this extraordinary influence. As the Tiger Asia episode illustrates, Hwang had long felt empowered to direct and encourage his employees to engage in trading that was, in fact, manipulative and intended by Hwang to be so. His expectations for obedience caused managers, like Park, to direct even young employees, like Tomita, to engage in questionable behavior. Hwang demanded secrecy and personal loyalty from his employees, including Tomita, and put them in positions where they could see that Hwang was misleading others within and without Archegos. Hwang once, for example, scolded Tomita for being forthright with a counterparty in front of his coworkers, with Hwang mocking Tomita for being an Eagle Scout. (*See, e.g.*, Trial Tr. 3416-17 (Tomita)). Hwang compounded feelings of isolation and subservience among his employees through fits of cruelty, such as his treatment of the traders during the pandemic. While none of these circumstances excuse Tomita's own conduct—and he has never suggested they do—these facts do provide some context to explain why someone who has never otherwise engaged in deceptive or wrongful behavior, and has demonstrated a genuine desire to help his coworkers and others, could have engaged in such a significant fraud.

Second, Tomita has expressed a laudable level of remorse and self-reflection regarding the crime. At no time has Tomita minimized his role or diminished his personal responsibility for the events and conduct in question. To the contrary, Tomita has frequently and emotionally conveyed his sorrow for his actions and the adverse consequences and the pain it has caused victims. The sentiments expressed in Tomita's letter to the Court echo remarks he has made to the Government throughout his cooperation.

Third, and akin to Scott Becker, Tomita participated in a fraud that primarily served Hwang's interests and followed Hwang's design. Tomita, Becker, and even Halligan largely did what Hwang expected and, at times, expressly instructed them to do. In terms of relative culpability, Hwang stands apart from all others.

**V.   Analysis of Cooperation**

Under Section 5K1.1 of the Guidelines, the appropriate reduction in a defendant's sentence for his cooperation is determined based on, among other things, "the significance and usefulness

of the defendant's assistance," the "truthfulness, completeness, and reliability" of his information, the "nature and extent" of his cooperation, and the "timeliness of the defendant's assistance." As measured by those factors, Tomita's cooperation was not only timely, significant, and reliable, but extraordinary. Indeed, Tomita was a model cooperator. He met with the Government nearly forty times—almost always in person and typically for multiple hours at a time—and he was consistently punctual, patient, and careful. Most importantly, he was honest, both about his own misconduct and about the misconduct of others. It was clear throughout the process that Tomita understood that he had made a grave error when he committed the crimes to which he pled guilty and was genuinely and thoroughly remorseful, and he was determined to address his mistake by helping the Government by faithfully recounting what happened—and never by lying in order to tell the Government what he thought prosecutors might want to hear.

Tomita's cooperation enabled the Government successfully to charge and prosecute one of the largest market manipulation schemes, and one of the largest fraud schemes targeting Wall Street, ever perpetrated. This investigation and prosecution resulted in the exposure of a massive fraud and manipulation scheme that genuinely put the American financial system at risk, and through his cooperation and testimony Tomita has helped bring awareness and reforms that may prevent future calamity.

1. **Significance and Usefulness of the Defendant's Assistance (5K1.1(a)(1))**

Tomita's cooperation was both highly significant and extremely useful, and it contributed substantially to the vindication of the public's interest in a particularly important and difficult case. As noted above, Tomita was the only percipient witness to testify regarding the market manipulation scheme orchestrated by Hwang, and his testimony enabled the jury to understand the mechanics and goals of the scheme.

It is true that much the scheme was carried out through trading instructions that were written from Hwang to his traders in Bloomberg chats, which were available and entered into evidence at trial. But without Tomita's assistance, the chats were nearly impenetrable to the Government, and his explanation of the meaning of the instructions and the idiosyncratic language used by Hwang enabled the Government to match the chats to trading data and to prove Hwang's conduct and intent. Although the Government had identified the contours of the market manipulation scheme prior to approaching Tomita, Tomita explained how the scheme actually worked—essentially the only witness to do so—and provided necessary context in the form of conversations directly with Hwang that made sense of data the Government had gathered. Similarly, without Tomita's clear and accessible explanations to the jury, it is not at all clear that the Government could have successfully proven its market manipulation case at trial. This case stands at the far end of the spectrum of complexity for any trial, and Tomita's testimony permitted the jury to draw reasonable conclusions in an area that was not only undoubtedly foreign to them, but particularly challenging to understand.

Tomita also provided critical information and testimony regarding Hwang's role with respect to the scheme to defraud Archegos's counterparties. Although there was some record evidence corroborating Hwang's involvement, it was only Tomita with whom Hwang spoke directly regarding interactions with the counterparties, and the case against Hwang would have been challenging if not impossible without Tomita's insight.

In short, Tomita's assistance made it possible to hold responsible the leader of this racketeering enterprise, for whose benefit these crimes were perpetrated and at whose direction an entire financial system was put at risk.

### 2. Truthfulness, Completeness, and Reliability of Information and Testimony (5K1.1(a)(2))

Tomita provided truthful, complete, and reliable information from the beginning of his cooperation. Tomita answered questions honestly, both during meetings with the Government and during direct and cross-examination. Tomita was careful to be precise and accurate, not to overstate or stray beyond the facts that he could remember, despite the pressures of testifying in a highly publicized and hotly contested trial. For example, Tomita frequently recalled particular episodes or conversations, which were able to be corroborated by exchanges buried in Bloomberg chats or text messages. Indeed, the care with which Tomita approached his responsibilities as a cooperator was evident—he devoted his free time over months and even years to working through his memory of these events and at all times ensured that no one was left with a misimpression, favorable or unfavorable to any individual, of the documents and facts in this case.

### 3. "[N]ature and extent" of the Defendant's Assistance (5K1.1(a)(3))

Tomita's cooperation was extensive by virtually any measure. He met or spoke with the Government on nearly forty occasions, usually for hours at a time, often on short notice and, at least in the investigative phase, in a compressed time period. He walked the Government through hundreds if not thousands of documents, oftentimes going over the same documents again and again to ensure that the Government, and later the jury, fully understood the complex course of events. He made sure to provide the Government with any additional relevant documents and information, even when the evidence further implicated him. He testified over the course of nine days at trial, including many days of unusually intense cross-examination by multiple lawyers.

### 4. Any Injury Suffered, or Any Danger or Risk of Injury to the Defendant or His Family, Resulting from Assistance (5K1.1(a)(4))

Though no physical harm befell Tomita or his family, it is inherently risky for a criminal defendant to cooperate with the Government, particularly where his cooperation involved a scheme of such enormous magnitude and scale, and co-defendants of virtually limitless financial means. Tomita's cooperation also resulted in significant harm to his reputation. Tomita has had to leave the financial industry altogether and to begin a new career.

In considering Tomita's decision to assist the Government, the degree to which Hwang exercised cult-like control over Archegos employees cannot be overstated. As both Tomita and Becker explained during their testimony, there was a culture of loyalty to Hwang at Archegos. Dissenting opinions were not tolerated. This culture bred a deep-seated fear of what might happen to employees if they disobeyed Hwang. This culture of loyalty explains why so many other Archegos employees refused to testify truthfully about Hwang and Halligan's wrongdoing at Archegos. Tomita, however, broke with this culture and risked serious personal and professional consequences when he decided to assist the Government, plead guilty, and testify at trial against Hwang and Halligan.

Notably, Tomita made his choice to break from Archegos despite his close personal connection to Hwang. Hwang in many respects dominated Tomita's professional life for more than a decade, employing him when he was a young man, training him, modeling the behavior he expected Tomita to emulate, involving himself in Tomita's personal life—including, at times, matters of religious faith—and shaped Tomita's life to be in service to Hwang's. Tomita's decision to forsake that relationship, to admit what had happened, and to confront his boss and mentor in a public courtroom deserves extraordinary consideration.

### 5. Timeliness of the Defendant's Assistance (5K1.1(a)(5))

Tomita began cooperating immediately after he was approached by the FBI, and, as he testified and as has been corroborated by contemporaneous records, Tomita had decided that he could not hide from conduct and needed to come clean even before the FBI arrived. Tomita's prompt cooperation with the Government's investigation permitted the Government to work efficiently to evaluate the evidence it was gathering at the same time, and substantially assisted the Government in charging a large, extremely complex case unusually quickly and effectively.

## VI. Restitution and Forfeiture

In imposing sentence, the Court should order Tomita to pay restitution and to forfeit the proceeds of his offense.

### 1. Restitution

The Government respectfully requests that the Court order Tomita to pay restitution in the total amount of $1,568,253,586 (one billion five-hundred sixty-eight million two-hundred fifty-three thousand five-hundred eighty-six dollars) pursuant to 18 U.S.C. § 3663 and 18 U.S.C. § 3663A, to the victims of the offenses charged in Counts One, Two, and Three. This amount consists of one-sixth of the sum of (i) the $9,376,525,023.18 (nine billion three-hundred seventy-six million five-hundred-twenty-five thousand twenty-three dollars and eighteen cents) loss amount determined by the Honorable Alvin K. Hellerstein, United States District Judge for the Southern District of New York, in the Hwang matter as to the counterparty banks and (ii) the $32,996,491.58 (thirty-two million nine-hundred ninety-six thousand four-hundred ninety-one dollars and fifty-eight cents) loss amount determined by Judge Hellerstein in the Hwang matter as to certain former Archegos employees.

A proposed restitution order is enclosed as Attachment A.

### 2. Forfeiture

The Government respectfully requests that the Court order Tomita to forfeit the compensation that he received from Archegos in 2020 and 2021, namely the sum of $1,780,000.

The parties are discussing a proposed order to effectuate that forfeiture and, in advance of sentencing, the Government will provide the Court with a proposed order.

## VII. Conclusion

In light of the foregoing, the Government respectfully submits that Tomita's assistance was "significan[t] and useful[]" to the Government in its investigation and prosecution of a major fraud and manipulation scheme. *See* U.S. Sentencing Guidelines § 5K1.1(a)(1). The Government also believes that the information provided by Tomita was "truthful[], complete[], and reliab[le]." *See id.* § 5K1.1(a)(2). Accordingly, assuming that Tomita continues to comply with the terms of his cooperation, and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Tomita in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
Alexandra N. Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys

cc: Helen V. Cantwell, Esq.
Douglas S. Zolkind, Esq.
Steven Tegrar, Esq.